# Richmond

## State Farm Mutual Automobile Insurance Company v. Elbert B. Smith.

June 14, 1965.

Record No. 5957.

Present, All the Justices.

*E. Page Preston* (*Preston & Preston*, on brief), for the plaintiff in error.

*J. Carroll Fears, Jr.* (*Taylor, Gustin, Harris, Fears & Davis*, on brief), for the defendant in error.

GORDON, J., delivered the opinion of the court.

Elbert B. Smith, who had obtained a judgment for $4,500 against Elaine R. Mellow for injuries sustained in an automobile accident, brought this action against State Farm Mutual Automobile Insurance Company ("State Farm") upon its automobile policy naming Elaine R. Mellow as the insured.[1]

The automobile driven by Elaine R. Mellow and involved in the accident was owned by her sister's husband, Francis J. Frost. Therefore, and because of the policy provisions to be discussed, the questions involved are: (1) Was Elaine R. Mellow both a relative of Francis J. Frost and a resident of the same household? (2) Had the automobile driven by Elaine R. Mellow been furnished to her for regular use? If the answer to either question is yes, State Farm must win this appeal.

The accident happened in Norfolk, Virginia. The circumstances that led to Elaine R. Mellow's presence in Norfolk and her driving the automobile owned by her brother-in-law are most relevant and will be outlined.

Elaine R. Mellow was dwelling[2] on December 2, 1962, the day of the accident, in the trailer-home of her sister (Gertrude Marie Frost) and brother-in-law (Francis J. Frost) on Virginia Beach Boulevard. She had come to Norfolk with her two infant sons in October 1962, about eight weeks before the accident, intending to stay with her sister until her baby was born. Elaine R. Mellow's husband had

---

[1] When the policy was issued, the insured was the widow of one Smith, and the policy correctly named her as Elaine R. Smith. Before this suit was instituted, she married Donald G. Mellow. Her present name is used in this opinion—in part to avoid confusion with Elbert B. Smith, the plaintiff and appellee, who is not connected by marriage or blood with Elaine R. Mellow or her deceased husband, Smith.

[2] The verb "dwell" is used in the statement of facts to avoid the legal conclusion that would be implied by "reside" (since the word used in the policy under discussion is "resident") or by "visit" or "sojourn".

died recently, and, upon her leaving California to travel to Norfolk, she was four months pregnant.[3]

Elaine R. Mellow brought her family's clothing with her, when she came to Norfolk, but she did not bring any furniture or furnishings or appliances. The record does not indicate whether she paid for food and lodging or defrayed any of the extra expenses involved in her family's stay with the Frost family. But she did "put" gas in Frost's automobile, at her expense.

The Mellow family dwelled with the Frost family—which included the husband, Francis J. Frost (who, for reasons stated later, was rarely at home), his wife, and their two young children—throughout her stay in Virginia, first in an apartment rented by Frost and, later, in the trailer-home to which the Frost family moved. About one week after the accident or two months after her arrival in Norfolk, and before the baby was born, Elaine R. Mellow left Virginia at the suggestion of her mother-in-law, returning to California to live with the mother-in-law.

When she came to Virginia, Elaine R. Mellow left her Ford automobile, which was described in the insurance policy issued by State Farm as the "Owned Automobile", in California. The only automobile available to her sister and her, while she was in Norfolk, was an Oldsmobile owned by Frost. It was not covered by insurance, unless covered, when driven by Elaine R. Mellow at the time of the accident, by the State Farm policy now under discussion.

As already indicated, Frost was rarely at home during the stay of his sister-in-law in Virginia. He was an enlisted man in the

---

[3] Elaine R. Mellow's testimony, relating to her reasons for going to Norfolk and her intentions respecting the duration of her stay in Virginia, was as follows:

"Q. . . . And it was your intention to go back there [to Norfolk] to have your baby? A. Yes.
" * * *

"Q. Mrs. Mellow, the express purpose of your going back to Virginia to stay with your sister was that you were pregnant at that time? A. Yes.

"Q. And you were going back there to have your baby in the company of your sister? A. Yes.

"Q. Did I understand you to say that you were approximately four months pregnant when you went back to Virginia? A. When I left, yes.

"Q. And I would take it from that, then, in the normal course of events, you anticipated staying back there for quite some time, did you not? A. Yes.

"Q. At least until you delivered your child, and then maybe for some time after that? A. Yes."

Gertrude Marie Frost testified:

"Q. Mrs. Frost, . . . when she came there to your home how long was she to stay? A. Until after her baby was born.

"Q. Then what was she to do? A. To go on back home."

United States Navy on sea duty, and returned to his home for brief visits while his sister-in-law was there. While at home before the accident, Frost gave permission to Elaine R. Mellow to use the Oldsmobile whenever it was needed; the permission given to use the automobile, according to her testimony, was "Whenever I needed to or my sister". Her sister could not drive. The keys to the automobile were left on a table in the Frost home.

The evidence supports the conclusion that only Frost drove the automobile while he was home on leave. Although Elaine R. Mellow was not positive that she did not drive the automobile while he was home for the second time, she expressed the belief that she did not; and there is no testimony that she did. Before using the automobile at any time, she asked and secured her sister's permission for the use.

Elaine R. Mellow drove the automobile on approximately ten occasions. On two or three occasions the automobile was used for her purposes, but on other occasions it was used for the benefit of her sister—for such purposes as transporting the Frost children to or from school, or transporting groceries. She never drove the car without passengers; her sister or a friend of her sister was with her on each occasion. At the time of the accident, Elaine R. Mellow, her sister and their children were going to a friend's apartment to wash clothes and stay over the weekend. (The supply of electricity had been cut off in the trailer-home.)

At the conclusion of the plaintiff's evidence in this case, the defendant (State Farm) having offered no evidence, the court discharged the jury and entered summary judgment for the plaintiff. State Farm does not contend that the court erred in failing to submit the issue to the jury. (Counsel for each party had taken the position that his client was entitled to a judgment as a matter of law.) Its contention, in the trial court and here, was that in view of the facts, which are not in dispute, error was committed in holding that Elaine R. Mellow was covered by the State Farm policy issued to her, while driving the Oldsmobile at the time of the accident in question.

State Farm contends, first, that the Oldsmobile driven by Elaine R. Mellow at the time of the accident was not covered by its policy; that coverage was afforded only with respect to an "Owned Automobile" or a "Non-Owned Automobile", and the Oldsmobile was neither an "Owned Automobile" nor a "Non-Owned Automobile", as those terms are defined in the policy. We agree

that, since the Oldsmobile was obviously not an "Owned Automobile", coverage was afforded only if it was a "Non-Owned Automobile". If it was not a "Non-Owned Automobile" (as defined in the policy) and therefore not covered under Insuring Agreement II—Non-Owned Automobiles, the Oldsmobile fell within a third category not mentioned in or covered by the policy. We must determine, then, whether the Oldsmobile fell within the policy definition of a "Non-Owned Automobile", under the facts of this case.

Under the definition contained in the policy (see the relevant policy provisions set forth in the footnote[4]), the Oldsmobile was a "Non-Owned Automobile", if it was *not* owned by a "relative" of the insured, that is, if Francis J. Frost (the owner) was not a "relative" of Elaine R. Mellow (the insured). Since "relative", by the policy definition, means "a relative of the named insured who is a resident of the same household", the question is broken into two parts, whether Elaine R. Mellow and Francis J. Frost were relatives and whether they were residents of the same household.

Turning to the first part of the question, we find that the policy sets forth an *idem per idem* definition: a "relative" is defined as a

---

[4] "*Insuring Agreement I—The Owned Automobile. Coverages A and B—(A) Bodily Injury Liability and (B) Property Damage Liability* (B coverage not involved in this case).

(1) To pay all damages which the insured shall become legally obligated to pay because of (A) bodily injury sustained by other persons * * * caused by accident arising out of the maintenance, ownership or use * * * of *the owned automobile.*" (Emphasis supplied)

\* \* \* \* \* \* \* \*

"*Insuring Agreement II—Non-Owned Automobiles.*

"Such insurance as is afforded by this policy under coverages A, B, Division 2 of C and M, D, D-50, F. G and H with respect to the owned automobile applies to the use of a non-owned automobile by the named insured * * * provided such use is with * the permission of the owner or person in lawful possession of such automobile.

"*Insuring Agreement II does not apply:*

"(1) to a non-owned automobile * * * (b) hired by or furnished to the named insured or a relative for regular use * * *".

\* \* \* \* \* \* \* \*

"*Definitions—Insuring Agreements I and II.*

"Named Insured—means the individual so designated in the declarations and also includes his spouse, if a resident of the same household.

"*Relative*—means a relative of the named insured who is a resident of the same household.

"*Owned Automobile*—means the private passenger automobile * * * described in the declarations * * *".

"*Non-Owned Automobile*—under coverages A, B, D and M means an automobile * * * not owned by the named insured or any relative * * *".

"relative", with no indication of the sense in which the word is used. The meaning ascribed to the word by dictionaries may usually be a relative by blood *or* affinity (see *Webster's Third New International Dictionary*, p. 1916); but this may not be the common-parlance or the legal meaning, particularly when interpreting a policy prepared by the insurer. (See *Preferred Accident Ins. Co.* v. *Onali*, 125 F.2d 580 (8th Cir.); *Indiana Lumbermens Mutual Insurance Company* v. *Richard Passalacqua*, 30 Misc.2d 626, 211 N.Y.S. 2d 62.) We do not intimate, however, any future holding on this point. A holding here is unnecessary since, in our opinion, Elaine R. Mellow and Francis J. Frost were not residents of the same household and, therefore, not "relatives", as defined in the policy.

The meaning of "resident" or "residence", a prolific source of litigation, depends upon the context in which it is used.[5] Here, we must interpret the meaning of "resident", when followed by "of the same household". The word "household", which has been defined as set forth in the footnote,[6] connotes a settled status; a more settled or permanent status is indicated by "resident of the same household" than would be indicated by "resident of the same house or apartment". We interpret the language of the policy as excluding coverage if Elaine R. Mellow had assumed a residence and become so intertwined with the Frost family as to become a member of that family,[7] and as extending coverage if she was a visitor or sojourner in the Frost home.

The proper conclusion to be drawn from the facts in this case is that Elaine R. Mellow was a visitor or sojourner in the Frost home

[5] For example, "residence", as used in the election laws, has substantially the same meaning as "domicile" (see *Dotson* v. *Commonwealth*, 192 Va. 565, 66 S.E.2d 490), whereas in other contexts "domicile" and "residence" have different meanings. (See *State-Planters Bank* v. *Commonwealth*, 174 Va. 289, 295, 6 S.E.2d 629, 631.)

[6] "Whether the term 'household' or 'family' is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a 'collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness'." See *Lumbermens Mut. Casualty Co.* v. *Pulsifer*, 41 F.Supp. 249, 251 (D. Me.).

[7] The appellant contends that the term "member of the same household", used in certain automobile policies, is more limited than "relative who is a resident of the same household", though the appellant concedes that the Texas court apparently regarded the terms as synonymous in *State Farm Mutual Automobile Ins. Co.* v. *Walker*, 334 S.W.2d 458 (Tex. Civ. App.), 78 A.L.R.2d 1395. Since "household" is usually taken to refer to a group of persons, rather than a building, it appears appropriate to interpret the term, resident of the same household, as meaning: resident of the same homestead and member of the same household. See *State Farm Mutual Automobile Ins. Co.* v. *Walker, supra*.

and, therefore, was driving a "Non-Owned Automobile" at the time of the accident. She came to Norfolk for a limited period of time, limited to the remaining period of her pregnancy. Her original plan was altered by another invitation; she left the Frost home upon receiving an invitation to live with her mother-in-law. Had she originally intended to be, or subsequently become, a resident of the Frost household, it is unlikely she would have agreed to a change of her settled status upon receiving another invitation. (There is no evidence of a strained relationship between Elaine R. Mellow and Frost or her sister, resulting from the accident.) The evidence as a whole does not support a finding that Elaine R. Mellow was a resident of the Frost household.[8]

In *Goens* v. *Arinder*, 248 Miss. 806, 161 So.2d 509, it was held that a daughter, who, with her husband and child, was living in her father's home until her baby was born and her house completed, was a visitor or sojourner in her father's home and not "a resident of the same household" as her sister (who was a member of the father's household). In *Lumbermens Mut. Casualty Co.* v. *Pulsifer*, *supra*, 41 F.Supp. 249 (D. Me.), it was held that where two families came together as a temporary arrangement, there was no merger of the two families to make one family or one household, within the meaning of the language of the policy excluding coverage if the driver of the vehicle was a "member of the household" of the insured.

State Farm relies principally upon *Third National Bank* v. *State Farm Mut. Auto. Ins. Co.*, 334 S.W.2d 261 (Ky.). There, the policy excluded coverage for bodily injuries "to the insured or any member of the family of the insured residing in the same household as the insured". The court held that the persons in question were all of the same family and resided in the same household. The evidence in that case however, did not indicate a sojourn or visit for a limited period of time, but a joining of and melding with the family group for an indefinite period of time. (See *State Farm Mutual Automobile Insurance Co.* v. *Pennington*, 324 F.2d 340 (8th Cir.), wherein the

---

[8] Counsel for State Farm contends that Elaine R. Mellow's unsettled residence before she came to Virginia supports its position that she became a resident of the Frost household. In March 1962 she lived in a friend's home in Manteca, California, where she stayed for one month, and she subsequently stayed at another address in Manteca and then in Modesto, California, before coming to Norfolk in October 1962. Migrations before coming to Virginia, however, do not tend to prove she was a resident of the Frost household while in Virginia. See *American Casualty Company* v. *Crook*, 301 F.2d 846 (4th Cir.),

court commented upon the *Third National Bank* case and upon other cases holding that coverage was excluded under the terms of the policies in issue, but declined to follow those cases, in part because of the different factual situation presented in the *Pennington* case.)

■ Having found that Frost's automobile, when driven by Elaine R. Mellow, was a "Non-Owned Automobile", we turn to the remaining question, whether it was "furnished to the named insured [Elaine R. Mellow] . . . for regular use . . . ". If so, coverage is excluded under the terms of the State Farm policy, even though she was driving a Non-Owned Automobile at the time of the accident (see footnote 4).

Elaine R. Mellow clearly had permission from the owner, Frost, to drive his automobile. But it is equally clear that to give "permission" is different from to "furnish". The two words usually convey different thoughts, and the insurer obviously did not intend that they be regarded as synonymous: "Permission" is used in Insuring Agreement II—Non-Owned Automobiles, and "furnished" in the exclusionary clause under consideration. It is appropriate, then, to consider Frost's principal purpose or intent, respecting the driving of the automobile by Elaine R. Mellow, to determine whether we have here a case of permission given, on the one hand, or of furnishing for regular use, on the other hand.

As indicated by the only direct testimony of the words used by Frost, in giving permission to Elaine R. Mellow, he coupled her use of the automobile with use for his wife's needs. Elaine R. Mellow testified that he gave permission for the use of the automobile "Whenever I needed to or my sister". The best evidence of the permission granted, moreover, is not Elaine R. Mellow's recollection of the precise words used by Frost, when her depositions were taken more than a year after the accident, but her actions or practical construction of the permission given. She testified, and her sister corroborated her testimony, that she never drove the automobile without first asking her sister's permission. Also, she did not have possession of the keys to the car; they were left on a table in the Frost home.

The evidence in this case supports the finding that Frost's primary purpose or intention, in giving permission, was to provide transportation for the Frost family while he was at sea. The automobile would not have been available for the family's use, unless Elaine R. Mellow,

who alone could drive it, was given permission to drive the automobile. And she did not drive it while Frost was at home.

The permission for Elaine R. Mellow to drive the automobile for her own purposes was, in our opinion, incidental. It might be regarded as a courtesy to her for the service rendered to the Frost family. She drove the automobile only two or three times for her own purposes and, on those occasions, she was accompanied by her sister or her sister's friend.

We interpret the language "furnished to the named insured for regular use" as referring to the furnishing for the insured's own purposes, and not the furnishing for the owner's or his family's purposes, with incidental permission for use by the insured for her purposes. As was said by another court: "It is unnecessary to hold that the words 'regular use' as used in these policies referred to an exclusive use. But 'regular use' reasonably suggests a principal use as distinguished from a casual or incidental use." See *Pacific Automobile Ins. Co.* v. *Lewis*, 56 Cal.App.2d 597, 600, 132 P.2d 846, 848. This interpretation appears most apt where, as in this case, the terms of the permission required, or were interpreted by the insured to require, further permission from the owner's wife on each occasion when the automobile was driven.

This is a case of first impression in Virginia, and we have not been referred to a case from another jurisdiction involving like permission to use and like use of an automobile.

The plaintiff here relies principally upon *Giokaris* v. *Kincaid*, 331 S.W.2d 633 (Mo.), 86 A.L.R.2d 925, involving facts similar in certain respects to those in this case. One of the questions presented was whether a grandmother's automobile, driven by her grandson at the time of the accident, had been furnished to his mother for regular use. The grandmother, who could not drive, had delivered a set of keys to the mother. The trial court's finding that the automobile had not been furnished for the mother's regular use, based on evidence that the automobile was driven by her "when the grandmother wanted to go some place", was affirmed.

State Farm cites *Rodenkirk* v. *State Farm Mut. Automobile Ins. Co.*, 325 Ill.App. 421, 60 N.E.2d 269, in support of its position that the Frost automobile was furnished to Elaine R. Mellow for regular use. But the facts in that case are distinguishable from those in the case at bar. The owner of the automobile, upon being inducted into the Army, turned over the automobile to his fiancee, giving her the only set of keys. He stated that not only was his

fiancee to have the use of the automobile, but that her father, who was a mechanic and could keep it in proper condition, could use the automobile also. The automobile, therefore, was turned over to two persons—to the fiancee for her use, and to the father for maintenance and his use. It was held that the automobile had been furnished to the father, who was involved in an accident, for regular use. To the extent that the *Rodenkirk* case may be taken to imply that regular use, within the meaning of the policy, may be casual or incidental, the Illinois court apparently expressed the contrary view in a later case. See *Schoenknecht* v. *Prairie State Farmers Insurance Association*, 27 Ill.App.2d 83, 169 N.E.2d 148.

In *Rodenkirk* v. *State Farm Mut. Automobile Ins. Co., supra,* the court stated that the purpose of the policy exclusion, in the case of automobiles furnished for regular use to the insured or members of his household, appeared to be: To protect the insurer "where an insured could pay for one policy and be covered by the insurance in driving any car that he decided to use whether owned by him or members of his family, or cars that had been furnished for his regular use; in other words, cars under his control that he could use at will and might use often." See 325 Ill.App. 421, 433, 60 N.E.2d 269, 274.

This purpose is not defeated by our holding in this case. We do not have here a case of two automobiles available to members of the same household, nor, even, of two automobiles available for driving by two persons dwelling together. Furthermore, as already indicated, the Frost automobile was not under Elaine R. Mellow's control nor, in view of the permission given by Frost as interpreted by her, could she use the Frost automobile at will.

We hold that the State Farm policy involved in this case afforded coverage to Elaine R. Mellow at the time of the accident, since she was not a resident of the household of the owner of the automobile, and since the automobile had not been furnished to her for regular use, within the meaning of the policy.

In reaching this conclusion we have not overlooked certain testimony, which was not mentioned in the statement of facts in this opinion. Elaine R. Mellow answered "yes" to these questions put to her by counsel for State Farm: "And correct me if I am wrong, but I take it that you intended to actually live in the same household with your sister during this time?"; "And from the time that you arrived there until the time of the accident, you and your sister and her family and your family resided in the same house-

hold?"; "And that [the Frost automobile] was left there at the apartment for your regular use?"; "And he left it there for your regular and daily use?". The questions called for legal conclusions. They incorporated words used in the policy, and they were designed to determine, by the answers given by the witness, the issues between the plaintiff and the defendant in this case. This testimony, therefore, has no probative value. For cases disapproving the admission of expert testimony directed to the issue being litigated, see *United States* v. *Spaulding*, 293 U.S. 498, 55 S. Ct. 273, 79 L. ed. 617; *Va. Coal & Iron Co.* v. *Ison*, 114 Va. 144, 75 S.E. 782; *Sparks* v. *Ribicoff*, 197 F.Supp. 174 (W.D. Va.).

The judgment in this case is affirmed. In view of the stipulation of counsel that the decisions in the companion cases of *State Farm Mutual Automobile Insurance Company* v. *Marjorie Smith*, Record No. 5958, and *State Farm Mutual Automobile Insurance Company* v. *Cheryl Smith, an infant, etc.*, Record No. 5959, involving identical issues, will be controlled by the decision in this case, mandates affirming the judgments in those cases will be issued also.

*Affirmed.*